UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10307-GAO

JEFFREY SCHRAM, Individually; and E-PROBATE, LLC, a California Limited Liability
Company,
Plaintiffs,

v.

PMC INSURANCE AGENCY, INC., a Massachusetts Corporation; DAVID M. MALLOY,
Individually; and ANDREW SHAW, Individually,
Defendants.

ORDER ADOPTING REPORT AND RECOMMENDATION
February 1, 2023

O'TOOLE, D.J.

The magistrate judge to whom this matter was referred has filed a Report and
Recommendation ("R & R") concerning the plaintiffs' Motion for Preliminary Injunction Relief
(dkt. no. 71) and their second Motion for Preliminary Injunction Relief (dkt. no. 85). The R & R
recommends that both motions be denied. No objections to the R & R have been filed.

After review of the relevant pleadings and submissions, I concur with the magistrate
judge's analysis and proposed ruling and therefore ADOPT the R & R (dkt. no. 111) in its entirety.
Both motions are DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

JEFFREY SCHRAM,
Individually; and E-
PROBATE, LLC, a California
Limited Liability Company,          No. 20-cv-10307-GAO
        Plaintiffs,


            v.

PMC INSURANCE AGENCY, INC.,
a Massachusetts
Corporation; DAVID M.
MALLOY, Individually; and
ANDREW SHAW, Individually,
        Defendants.

**REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTIONS FOR**
**PRELIMINARY INJUNCTION; MEMORANDUM AND ORDER**
**ON DEFENDANTS' MOTION TO STRIKE**

CABELL, U.S.M.J.

From 2006 to 2009, plaintiff Jeffrey Schram ("Schram") developed a web-based, pay-as-you-go software system for the insurance industry to manage payment of premiums ("Plaintiff's Pay-As-You-Go Software"). (D. 71-1, ¶ 3) (D. 76, ¶ 6). Under a 2010 Operating Agreement, Schram and defendant PMC Insurance Agency, LLC ("PMC Insurance"), a wholesaler of workers' compensation policies, agreed to form a company, PMC PayGo, LLC ("PayGo, LLC"), to facilitate "the implementation of software products to support 'pay-as-you-go' insurance sales." (D. 76-1,

§§ 1.1, 1.3) (D. 71-1, ¶ 14) (D. 45, ¶ 15) (D. 48, ¶ 15).  In a related Asset Purchase Agreement, PayGo, LLC purchased certain source code and proprietary rights of Plaintiff's Pay-As-You-Go Software ("PayGo software" or "PayGo software system") from TendToBusiness, Inc., Schram's company, with the understanding that Schram would acquire a 49% interest in PayGo, LLC.  (D. 76-2, ¶¶ 1-2) (D. 76, ¶ 9) (D. 76-1, ¶ 6.7.1).

Schram and plaintiff E-Probate, LLC ("E-Probate") allege that PMC Insurance breached the Operating Agreement and that defendants David M. Malloy ("Malloy"), Andrew Shaw ("Shaw"), and PMC Insurance ("defendants") breached their fiduciary duties by:  diverting PayGo, LLC's revenues to other insurance carriers; selling pay-as-you-go products of other companies to customers of PayGo, LLC; and concealing this diversion of revenue from Schram.  (D. 45, ¶¶ 35, 44, 66, 72, 77, 80-83).  The defendants' conduct allegedly reduced PayGo, LLC's revenues and deprived Schram of "his distribution from [PayGo, LLC's] revenues."  (D. 45, ¶¶ 42, 46, 59-60, 62, 72, 77).

Pending before this court are two preliminary injunction motions filed by Schram and E-Probate ("plaintiffs").  (D. 71, 85).  The defendants oppose the preliminary injunction motions and also move to strike paragraphs 25, 32, and 33, and the last three words of paragraph 26 in Schram's November 12, 2021 affidavit.  (D. 79, 90, 91) (D. 71-1, ¶¶ 25-26, 32, 33).  For reasons outlined

below, this court recommends that both preliminary injunction
motions be denied and that the motion to strike be allowed.

I.  **PROCEDURAL BACKGROUND**

A first amended complaint sets out the following claims: (1)
breach of fiduciary duty against the defendants (Count One); (2)
breach of the Operating Agreement against PMC Insurance (Count
Two); and (3) breach of the implied covenant of good faith and
fair dealing in the Operating Agreement against PMC Insurance
(Count Three).  In March 2021, this court recommended a dismissal
without prejudice of Counts Four and Five.  (D. 44).  The court
adopted the recommendation.  (D. 60).

The first preliminary injunction motion grounds the
reasonable likelihood of success regarding Counts Two and Three on
sections 6.3 and 6.7.1 of the Operating Agreement.  The latter
section reads as follows:

> Section 6.7 Specific Obligations of Individual Members.
>
> Section 6.7.1 PMC Obligations.
> . . Commencing upon the date of the execution of this
> Agreement and until PMC PayGo, LLC no longer operates the
> businesses compromising the Subject Assets acquired from
> TendToBusiness, Inc., PMC [Insurance] shall not directly or
> indirectly, or as a partner, shareholder,      employee,
> manager or otherwise, own, mange, operate, control, be
> employed by, participate in, or otherwise be connected with
> any other insurance PayGo activity without participation of
> PMC Paygo LLC.

(D. 76-1, § 6.7.1).  The plaintiffs submit that PMC Insurance
violated section 6.7.1 by disclosing confidential and proprietary

information to Nixer Comp, Inc. ("Nixer Comp"), by transferring
proprietary information to Nixer Comp, and by working with Nixer
Comp to develop a competing pay-as-you-go system without PayGo,
LLC's participation.[1]   (D. 71, pp. 6-8, 12-13).   Nixer Comp is a
managing general underwriter which markets and collects premiums
of policies on behalf of an underwriting carrier.   (D. 76, ¶ 15).

The plaintiffs contend PMC Insurance violated section 6.3 by
acquiring an equity interest in Nixer Comp under "a shareholder
addendum" to transfer Nixer Comp stock to PMC Insurance and to
William Nagel ("Nagel"), a senior vice president and executive
director of PMC Insurance's staffing programs division.   (D. 84,
p. 2, n.2) (D. 84, p. 4) (D. 84-3, p. 3).   The plaintiffs further
argue the defendants violated section 9.7 "[b]y transferring
software specifications, transferring software specifications,

---

[1]   Citing sections 6.7.1, the plaintiffs broadly argue that the
defendants breached the terms of the Operating Agreement and the
covenant of good faith and fair dealing.   (D. 71, pp. 12-14).
The plain language of section 6.7.1, however, applies to PMC
Insurance.   (D. 76-1, § 6.7.1).   Likewise, Counts Two and Three
allege that PMC Insurance, as opposed to all defendants,
breached the Operating Agreement and the covenant of good faith
and fair dealing.   (D. 45).   At present, the plaintiffs do not
elaborate the basis for Malloy's and Shaw's aiding and abetting
liability in Counts Two and Three.   (D. 45, ¶¶ 86, 88).
Regardless, the absence of a reasonable likelihood of success on
the claims against PMC Insurance, with the exception of one
claim, along with the complete absence of irreparable harm
render injunctive relief on the aiding and abetting claims
inappropriate.

know-how, business practices and software underpinnings" to Nixer Comp.  (D. 84, p. 4).

The first preliminary injunction motion requests ordering the defendants: (1) "to cease assisting or aiding any third-party to develop, modify, refine or correct a Pay-As-You-Go system"; (2) "not to access [PayGo, LLC's] Pay-As-You-Go source code or database and not to share or disclose [PayGo, LLC's] source code or database to any other party"; (3) "not to directly or indirectly transfer any [PayGo, LLC] business practices or procedures, [and] its Pay-As-You-Go processes, practices and procedures to any third-party"; and (4) "to disclose to Plaintiffs' counsel the names, telephone numbers and addresses of all persons to whom [the defendants] shared/disclosed [PayGo, LLC's] confidential information, business practices, procedures or specifications, including, but not limited to," eight third parties, including Nixer Comp.  (D. 71, pp. 15-16).  The second preliminary injunction motion asks this court to order that: (1) "Shaw and Malloy return to PMC Insurance its equity shares in [PayGo, LLC]"; (2) the defendants comply with the Operating Agreement's terms "to continue funding [PayGo, LLC] and to pay the 0.7% of all premiums" for the insurance policies PMC Insurance "places that use a pay-as-you-go payment system"; (3) the defendants refund PayGo, LLC the money they took to pay their attorneys' fees and not take any additional money to pay such fees; and (4) the defendants "cease interfering with [PayGo,

LLC's] relations with its customers, such as AmTrust."  (D. 85, pp. 11-12).  With this background in mind, this court turns to the facts.[2]

## II.  **FIRST PRELIMINARY INJUNCTION MOTION (D. 71)**

### A.  **Factual Background**

From 2006 to 2009, Schram developed Plaintiff's Pay-As-You-Go Software for the insurance industry.  (D. 71-1, ¶ 3).  Plaintiff's Pay-As-You-Go software and, by extension, the PayGo software, facilitate accurate estimates of workers' compensation premiums by tracking an insured company's workforce during the term of an insurance policy.  As a result, they enable an insured company and its carrier to manage premium payments and minimize potential surprises associated with a premium audit at the end of

---

[2]  Neither party requests an evidentiary hearing and therefore waives such a hearing.  *See Graham v. Malone Freight Lines, Inc.*, 314 F.3d 7, 16 n.12 (1st Cir. July 21, 1999) ("issue of whether the district court should have held an evidentiary hearing has been waived"); *accord Novick v. Colvin*, Civil Action No. 16-11143-FDS, 2017 WL 1553162, at *7 n.9 (D. Mass. Apr. 27, 2017) (plaintiff's motion "does not address that point, and he is therefore deemed to have waived that argument.").  With respect to the separate issue of oral argument, the parties filed two rounds of briefing on the first preliminary injunction motion and the plaintiffs filed a reply to the defendants' opposition to the second preliminary injunction motion.  The record is fully developed, and oral argument will not assist this court in resolving the motions.  The defendants' request for oral argument under L.R. 7.1(d) (D. 91, p. 20) is therefore denied.  *See generally Reyes-Perez v. State Ins. Fund Corp.*, 755 F.3d 49, 53 n.8 (1st Cir. 2014) ("[d]istrict courts have broad latitude to enforce local rules").

a policy term.   (D. 76, ¶ 6) (D. 45, ¶ 17) (D. 48, ¶ 17) (D. 71-1, ¶ 10).

In 2010, Schram and PMC Insurance formed PayGo, LLC under the terms of the July 2010 Operating Agreement.  (D. 45, ¶ 11) (D. 48, ¶ 11) (D. 76-1, § 1.1).   Under the July 2010 Asset Purchase Agreement, TendToBusiness, Inc. ("TendToBusiness") sold the "exclusive right" and title to the PayGo software created by Schram to PayGo, LLC.   (D. 76-2, pp. 2-3) (D. 76, ¶ 9) (D. 45, ¶ 25). PayGo, LLC therefore owns the PayGo software.   (D. 76-2, ¶ 2) (D. 76, ¶ 11).   Indeed, at a deposition, Schram testified that PayGo, LLC "came to own the software" in 2010 "when we did" the Operating Agreement and the Asset Purchase Agreement.   (D. 78-3).   In consideration of the transfer, PayGo, LLC agreed to convey a 49% interest in PayGo, LLC to TendToBusiness, which agreed to immediately convey that 49% interest to Schram.   (D. 76-2, ¶ 4).

The PayGo software consists of source code for two computer programs: one known as "e-payrite" and accessible on the internet at www.epayrite.com; and the other known as epli.us and accessible on the internet at www.eppli.us.   (D. 76-2, ¶ 1).   It also includes all other proprietary rights in the source codes and "all interest in the Internet domain[s] known as epayrite.com" and "epi.us." (76-1, ¶ 1).   The PayGo software therefore includes all or, at a

minimum, part of Plaintiff's Pay-As-You-Go Software, which Schram created.[3]  (D. 71-1, ¶¶ 3, 13, 15) (D. 76-1, § 3.3).

Pursuant to the Operating Agreement between PMC Insurance and Schram and the related Asset Purchase Agreement, PMC Insurance became a 51% owner and Schram became a 49% owner of PayGo, LLC. (D. 76-1, § 3.1) (D. 71-1, ¶ 14) (D. 76, ¶ 3) (D. 76-1, p. 29) (D. 76-2).  As a wholesaler and managing general agent, PMC Insurance sells workers' compensation policies to insurance agents.  (D. 45, ¶ 15) (D. 48, ¶ 15) (D. 71-1, ¶ 4).  It is also a middleman between insurance agents and workers' compensation "insurance carriers in the placement of" workers' compensation insurance.  (D. 71-1, ¶ 4).  As such, PMC Insurance "holds the [insurance] contracts with the carriers."  (D. 71-1, ¶ 4).  The ability of PMC Insurance to provide the PayGo software to insurance agents gives it a marketing edge and a means to expand its business with workers' compensation insurance carriers.  (D. 71-1, ¶¶ 6, 12).

Under paragraph 6.7.1 of the Operating Agreement, PMC Insurance agreed to fund the start-up costs and the operating

---

[3]  It is not entirely clear that the assets acquired by TendToBusiness and sold to PayGo, LLC (D. 76-2, ¶¶ 1-2) comprise *all* of the software Schram created from 2006 to 2009, i.e., all of "Plaintiff's Pay-As-You-Go Software" (D. 71-1, ¶ 3).  Hence, out of an abundance of caution, this court draws the above distinction.  That said, this court draws the reasonable inference that the assets sold to PayGo, LLC included all of the necessary and related software in Plaintiff's Pay-As-You-Go Software to track the insured's workforce and enable the management of premium payments.

expenses of PayGo, LLC, including the continued operation of "the epayrite.com and epli.us software" acquired from TendToBusiness, Inc.[4]  (D. 76-1, § 6.7.1).  Notably, the same paragraph prohibits PMC Insurance from owning, managing, operating, or participating in "any other insurance PayGo activity without the participation of [PayGo, LLC]."  (D. 76-1, § 6.7.1).

The Operating Agreement also requires PayGo, LLC to "enter into a service agreement with [E-Probate]."  (D. 76-1, § 6.7.1). Accordingly, in July 2010, E-Probate and PayGo, LLC entered into a Managed Service Agreement ("MSA").  (D. 76-3, 76-4) (D. 76, ¶¶ 13-14).  Under the MSA, E-Probate agreed to oversee maintenance of the PayGo software, and PayGo, LLC agreed to pay E-Probate a fee for its services.  (D. 76-3, p. 3).  In pertinent part, the MSA states: "Both E-Probate and [PayGo, LLC] will have *full access* to the software, equipment and all reports covered by this agreement . . . for the purposes of the operation and maintenance of [the PayGo, LLC] operating platform."  (D. 76-3, p. 4) (emphasis added). The MSA "requires that E-Probate" have "available all documentation, including *source code* of the PMC PayGo system in suitable condition and readily available to [PayGo, LLC] personnel

---

[4]   In March 2022, this court allowed a motion to compel arbitration.  (D. 98).  The motion identifies items to submit to arbitration including amendments of the Operating Agreement "to be in effect" going forward.  (D. 50).  This opinion interprets past conduct of the parties with respect to the Operating Agreement as it stood at that time.

(or approved individuals by [PayGo, LLC).”   (D. 76-3, p. 4)
(emphasis added).   In late December 2015 or early January 2016,
Schram transferred his 49% interest in PayGo, LLC to E-Probate.[5]
(D. 76, ¶ 3) (D. 45, ¶ 36) (D. 48, ¶ 36).   Thereafter, E-Probate,
as opposed to Schram, was entitled to receive distributions, if
any, of PayGo, LLC's net profits.   (D. 76-1, § 4.3).   PMC Insurance
continued to own a 51% interest in the company.   (D. 76-1, p. 29)
(D. 76, ¶ 3).

In the spring of 2017, the defendants and Schram discussed
his retirement and future involvement in PayGo, LLC.   (D. 45, ¶
41) (D. 48, ¶ 41).   The parties disagree whether they entered into
an agreement, which Schram denotes a "Succession Plan."   (D. 71-
1, ¶ 29) (D. 76, ¶ 22).   Schram attests he agreed to create "a
more robust Pay-As-You-Go software solution," migrate "the system
to the Microsoft Cloud," and, once completed, disengage from the
company's "day-to-day operations."   (D. 71-1, ¶ 29).   In return,
the defendants would continue to pay him 0.7% of all premiums
earned by PMC Insurance on policies sold using a pay-as-you-go
system (D. 71-1, ¶¶ 16, 19, 29), and he would "continue to receive
49% of the profits of [PayGo, LLC]" (D. 71-3, pp. 4, 12), according
to Schram.   In contrast, Shaw, a PayGo, LLC manager and executive
vice president of PMC Insurance, avers that PMC Insurance "never

---

[5]   Schram explains that he transferred the interest based on
advice from "his tax advisers."   (D. 45, ¶ 36).

entered into any 'succession agreement' with [Schram] or E-Probate." (D. 76, ¶¶ 1, 22) (D. 76-1, p. 5). Shaw further states that neither he nor Malloy, a PayGo, LLC manager, entered into any such agreement. (D. 76, ¶¶ 22, 23) (D. 76-1, p. 5).

Schram relies on a series of 2018 emails to document "the Succession Plan," which he states constitutes his "percentage interest in [PayGo, LLC]." (D. 71-1, ¶ 29) (D. 71-3). One of the 2018 emails attaches a "detailed [succession] plan" and requests Shaw review and approve the plan. (D. 71-3, p. 6). An attachment to the email similarly asks Shaw and Malloy to indicate their approval of the detailed plan. (D. 71-3, p. 2). Shaw did not respond to the February 2018 email. (D. 78-3, pp. 5-6) (D. 76, ¶¶ 22-23). By affidavit, Shaw states that neither he nor "Malloy ever approved any Succession Agreement in response to [these] email requests." (D. 76, ¶ 23). Considering Shaw's averments (D. 76, ¶¶ 22-23) coupled with Shaw's failure to reply to the requests in the email (D. 71-3) and the attachment asking Shaw to approve the detailed plan, it is unlikely the parties *mutually* agreed to the detailed Succession Plan.

In March 2020, PMC Insurance entered into a General Agency Agreement with Service American Indemnity Company ("SAIC") and Nixer Comp. (D. 84-1, p. 5). As set forth in the agreement, SAIC appointed PMC Insurance as its general agent to solicit and procure workers' compensation policies underwritten by SAIC. (D. 84-1, §

1.01).  Nixer Comp, the program administrator, collected all
premiums on behalf of SAIC and prepared a monthly premium report
for SAIC.  (D. 84-1, §§ 2.03, 6.01).  PMC Insurance "was not
involved in the development, programming or specifications of the
Nixer Comp [pay-as-you-go] system."[6]  (D. 90, p. 7, ¶ 2).
Similarly, PMC Insurance lacked "administrative access to the
Nixer Comp platform."  (D. 90, p. 7, ¶ 2).  The General Agency
Agreement is no longer in effect.  (D. 90, p. 7, ¶ 3).

A March 2020 email pertaining to the General Agency Agreement
refers to a "shareholder addendum" (D. 84-3, p. 3), under which
the plaintiffs assert PMC Insurance acquired "an equity interest"
in Nixer Comp in violation of section 6.3 of the Operating
Agreement (D. 84, p. 2, n.2) (D. 84, p. 4).  None of the defendants,

---

[6]   In a reply brief, the plaintiffs represent that the General
Agency Agreement "mandated that PMC Insurance and [Nixer Comp]
use a pay-as-you-go payment system."  (D. 84, pp. 3-4).  As
support, they cite exhibit A at Bates Number PMC0044885-6.  The
103-page exhibit contains no such Bates Number.  Relatedly, and
without citing any exhibit or Bates Number, the plaintiffs
assert that Nixer Comp "developed a pay-as-you-go payment system
under the guidance of PMC Insurance."  (D. 84, p. 4).  Due to
the lack of a sufficient citation to the factual record, this
court declines to accept the representation.  *See Pressley v.
City of New York*, Case No. 11-cv-03234, 2016 WL 1271480, at *3
(E.D.N.Y. Mar. 31, 2016) (affirming court's failure to accept
statement in memorandum because it "did not cite any factual
support" and court "not obligated to independently review the
entire record to determine if any such factual support
existed"); *see also Kulhawik v. Hodder*, 571 F.3d 296, 298 (2nd
Cir. 2009) ("attorney's unsworn statements in a brief are not
evidence") (citing *INS v. Phinpathya*, 464 U.S. 183, 188-189 n.6
(1984)).

however, had "an equity stake of any sort in Nixer Comp," including at the time the plaintiffs filed the first preliminary injunction motion.  (D. 90, p. 7, ¶ 1).

In or around April 2020, Nixer Comp was in the process of choosing a pay-as-you-go system.  (D. 76, ¶ 16).  At the time, Nixer Comp had a servicing contract with MIS Insurance Services ("MIS"), which included collection of premiums and processing of payments.  (D. 76, ¶ 15).  As MIS's client, Nixer Comp retained the ability "to decide what services [it] chose to render from MIS," including whether to use MIS's pay-as-you-go premium collection system or another provider's system.  (D. 76, ¶¶ 7, 16).  In an April 2020 meeting, Shaw and Nagel made a marketing presentation of the PayGo, LLC software to Rob Schild ("Schild"), president of Nixer Comp.  During the meeting, Nagel and Shaw promoted the software as a solution for Nixer Comp's management of payroll premiums.  (D. 78-1, p. 6) (D. 78-2, p. 5) (D. 77, ¶ 7) (D. 76, ¶ 15).  In an April 16, 2020 email from Nagel to Schild, Nagel similarly pitched the PayGo software as the best solution to meet Nixer Comp's needs.  (D. 78-2, pp. 4-5).  Throughout this time, Nagel and Shaw were trying to sell or "pitch [the PayGo software] as the best solution" to meet Nixer Comp's needs.  (D. 78-1, p. 6) (D. 78-2, p. 5) (D. 77, ¶ 7) (D. 76, ¶ 15).  Nagel and Shaw did not disclose trade secrets or any other proprietary or confidential information, including intellectual property, of

13

PayGo, LLC during the April 2020 meeting or in other communications with Nixer Comp representatives.  (D. 76, ¶¶ 16, 20-21) (D. 77, ¶¶ 4, 6).  For example, "all of the information" in the April 16 and 17, 2020 emails (D. 71-5) "was public knowledge known to" individuals within the workers' compensation industry.  (D. 77, ¶ 4).  In fact, Schram filed the emails on the public docket without moving to file them under seal.  (D. 71-5).  Ultimately, Nixer Comp chose the pay-as-you-go premium collection system developed by MIS.  (D. 76, ¶¶ 15-17) (D. 71-6, p. 4).

In the communications and meetings Shaw had with Nixer Comp, Schram was not present.  (D. 76, ¶ 19).  Similarly, in the conversations and meetings Nagel had with Nixer Comp or MIS, Schram was not present.  (D. 77, ¶ 3).  Although Schram avers that certain "confidential information and processes" of "a successful Pay-As-You-Go system" were "divulged and communicated to Nixer" Comp (D. 71-1, ¶ 25), he lacks personal knowledge of the alleged disclosures and communications to Nixer Comp.  Accordingly, even if this court did not strike the paragraph listing the alleged confidential information and processes disclosed to Nixer Comp (D. 71-1, ¶ 25), the paragraph's averments are afforded far less weight than the more convincing averments and deposition testimony by Shaw and Nagel (D. 76, 77, 78-1, 78-2), who participated in the meetings and conversations with Schild.  In short, neither Shaw nor Nagel divulged confidential information, trade secrets, or proprietary

information of PayGo, LLC or PMC Insurance to Nixer Comp, MIS, or "other members of the insurance industry" during the relevant time period.[7]  (D. 76, ¶¶ 19-21) (D. 77, ¶¶ 4-6).

In September 2021, Shaw became concerned about the vulnerability of the PayGo software due to a rise in cyber security attacks.  He therefore decided PayGo, LLC needed to hire a cybersecurity consultant to assess the system's cybersecurity vulnerabilities.  As a result, on September 13, 2021, Shaw asked Schram for access to the source code for the PayGo software.[8]  (D. 76-5) (D. 76, ¶ 25).  More specifically, in a September 13, 2021 email from Shaw to Schram, Shaw explains that "[t]o allow the cyber/software assessment to move forward, we need a copy/access to the production source code for PMC PayGo and the login credentials for PMC PayGo."  (D. 76-5, p. 5).  A news report of a recent compromise in a Microsoft database, Azure Cosmos DB, lends credence to Shaw's request.  (D. 76-5, pp. 5-7).  Schram refused to provide such access leading Shaw to invoke PMC Insurance's majority percentage interest in PayGo, LLC (D. 76-1, § 6.1) and

---

[7]  Because this court would reach the same finding even considering paragraph 25, the motion to strike with respect to paragraph 25 (D. 79) is moot.

[8]  As previously noted, one of the four requests for injunctive relief is to order the defendants not to access "PayGo's Pay-As-You-Go source code" and not to share the source code with other parties.  (D. 71, p. 15).  The plaintiffs argue that Shaw sought to obtain the source code "under false pretenses."  (D. 71, p. 8) (D. 71-1, ¶¶ 26-27).

demand the login credentials in a September 15, 2021 email.  (D. 76-5, p. 2) (D. 76, ¶¶ 26-27).  In response to a further request from Shaw in late October 2021 to provide the login credentials for a cybersecurity assessment, Schram again refused to provide login credentials until Shaw "fulfill[ed] [his] part of the 'succession plan.'"  (D. 76-6, p. 3).

## B.  **Discussion**

The plaintiffs argue that PMC Insurance breached section 6.7.1 of the Operating Agreement[9] and that the defendants breached their fiduciary duties by: disclosing and/or transferring PayGo, LLC's confidential and proprietary information to Nixer Comp; working with and assisting Nixer Comp to develop a competing pay-as-you-go system; and seeking the source code and database for PayGo, LLC "to replicate the software."  (D. 71, pp. 11-14) (D. 84, pp. 1-2).  In addition to other arguments, the defendants maintain the plaintiffs fail to show that this misconduct occurred. Hence, the plaintiffs fail to establish a reasonable likelihood of success regarding the breach of fiduciary duty, the breach of the Operating Agreement and the Succession Agreement, and the breach of the implied covenant of good faith and fair dealing claims, according to the defendants.  (D. 75, pp. 14-17).

---

[9]   *See supra* n.1.

"A request for a preliminary injunction is a request for extraordinary relief." *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022), *petition for cert. docketed*, (U.S. Aug. 29, 2022) (No. 22-178).  The familiar analysis requires the plaintiff to "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Dist. 4 Lodge of the Int'l Ass'n of Machinists and Aerospace Workers Local Lodge 207 v. Raimondo*, 40 F.4th 36, 39 (1st Cir. 2022) (citation omitted).  "The first two factors are the most important" with the first factor "usually given particularly heavy weight." *Id*. at 42 (citations omitted); *accord We the People PAC v. Bellows*, 40 F.4th 1, 13 (1st Cir. 2022) (noting "likelihood of success on the merits . . . weighs most heavily in the preliminary injunction calculus") (citation omitted).  As the parties seeking the preliminary injunction, the plaintiffs "bear[] the burden of establishing that these four factors weigh in [their] favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006); *accord Noerand v. Devos*, 474 F. Supp. 3d 394, 403 (D. Mass. 2020), *appeal dismissed sub nom. Noerand v. Cardona*, 2021 WL 4452061 (1st Cir. May 20, 2021) (No. 20-1924) ("[p]laintiff bears the burden of establishing each of the four elements").

### 1.   Reasonable Likelihood of Success

### A.   Breach of Fiduciary Duty

Proceeding to the breach of fiduciary duty claim, such a claim "requires proof of four elements: (1) the existence of a fiduciary duty, (2) breach of that duty, (3) damages, and (4) a causal relationship between the breach and the damages." *Bache v. Town of Boxborough*, Civil Action No. 21-11187-FDS, 2022 WL 392819, at *7 (D. Mass. Feb. 9, 2022) (citing *Hanover Ins. Co. v. Sutton*, 705 N.E.2d 279, 288 (Mass. App. Ct. 1999)), *appeal filed*, 2022 WL 392819 (1st Cir. Mar. 14, 2022) (No. 22-1166).  Relative to the first element, the plaintiffs maintain that corporate officers "owe a fiduciary duty to the corporation, and certain shareholders owe this duty to one another."  (D. 71, p. 12).

Like "a partnership, 'the relationship among the stockholders [of a close corporation is] one of trust, confidence and absolute loyalty.'" *Selmark Assoc., Inc. v. Ehrlich*, 5 N.E.3d 923, 932 (Mass. 2014) (quoting *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 328 N.E.2d 505, 511 (Mass. 1975)).  In a close corporation, shareholders "owe one another substantially the same duty of utmost good faith and loyalty in the operation of the enterprise that partners owe to one another." *Int'l Bhd. of Elec. Workers Local No. 129 Benefit Fund v. Tucci*, 70 N.E.3d 918, 926 (Mass. 2017) (quoting *Demoulas v. Demoulas Super Markets, Inc.*, 677 N.E.2d 159, 179 (Mass. 1997)).  A close corporation is

"typified by: (1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation." *Donahue*, 328 N.E.2d at 511.

"Not all LLCs are close companies." *Allison v. Eriksson*, 98 N.E.3d 143, 152 n.14 (Mass. 2018). The foregoing "test for whether a corporation is closely held is not dispositive for determining whether an LLC is closely held." *Id.* at 152. Because limited liability companies "are creatures of contract, determining whether an LLC is closely held is a more fact-specific determination that will depend on the way in which a particular LLC is structured." *Id.* At present, the parties do not appear to dispute PayGo, LLC's status as a closely-held limited liability company. Accordingly, for present purposes only, this court assumes that PayGo, LLC is a closely-held limited liability company. As such, "the close corporation doctrine, and the strict fiduciary duty" of "utmost good faith and loyalty" the doctrine imposes, *id.*, apply to PayGo, LLC.

PMC Insurance, which holds the majority percentage interest in PayGo, LLC, therefore owed a fiduciary duty of "utmost good faith and loyalty" to E-Probate at the time E-Probate acquired a 49% interest in the company and thereafter. *See In re Lyman-Cutler, LLC*, 632 B.R. 355, 415 (Bankr. D. Mass. 2021) (members of limited liability company owe each other fiduciary duties under

Massachusetts law); *accord Tucci*, 70 N.E.3d at 926; *O'Connor v. Kadrmas*, 135 N.E.3d 226, 234 (Mass. App. Ct. 2019) (in close corporation, "shareholders owe 'each other a fiduciary duty of the "utmost good faith and loyalty"'") (citations omitted).  Prior to the time E-Probate acquired the 49% interest, PMC Insurance, as the holder of the majority 51% interest in PayGo, LLC, owed Schram, the holder of the minority 49% interest, the same fiduciary duty based on conduct during that time period. *See In re Lyman-Cutler,* 632 B.R. at 415; *Tucci*, 70 N.E.3d at 926.  Unlike PMC Insurance, Malloy and Shaw are not members but, rather, managers of PayGo, LLC.  (76-1, p. 5).  As such, they owe a fiduciary duty to the company, PayGo, LLC.[10]  *See In re Boston Grand Prix, LLC*, 624 B.R.

---

[10]  For present purposes *only*, this court will assume Malloy and Shaw, as managers of PayGo, LLC, owe a fiduciary duty to PayGo, LLC's members. *See Taylor v. Moskow*, Civil Action No. 13-12675-FDS, 2014 WL 2573990, at *5 n.2 (D. Mass. June 6, 2014) ("manager of an LLC owes a fiduciary duty to the LLC itself and its members") (citation omitted); *see also Butler v. Moore*, Civil No. 10-10207-FDS, 2015 WL 1409676, at *60 (D. Mass. Mar. 26, 2015) ("No court in Massachusetts appears to have clearly and explicitly held that the members of a closely held LLC owe one another fiduciary duties analogous to the duties imposed on the shareholders of a closely held corporation.").  An operating agreement, however, may expand or restrict the scope of a manager's duties and liabilities. *See* Mass. Gen. Laws ch. 156C, § 63(b)(2).  The defendants do not argue that section 6.4 of the Operating Agreement restricts their liability.  Hence, they waive the issue for purposes of adjudicating the present motions.  See *Diaz-Colon v. Fuentes-Agostini*, 786 F.3d 144, 149 (1st Cir. 2015).

1, 19 (Bankr. D. Mass. 2020) ("manager of a limited liability company owes a fiduciary duty to the company").

Turning to the second element, the defendants argue there is no reasonable likelihood of success of a breach of any fiduciary duty due to the lack of support in the record. (D. 75, 90). The breaches of fiduciary duty the plaintiffs identify are twofold: (1) "working with and assisting [Nixer Comp] to develop a competitive Pay-As-You-Go system"; and (2) "seeking the source code and database of [PayGo, LLC's] system." (D. 71, p. 12). In the event the factual record does not support a reasonable likelihood of success as to these breaches of fiduciary duty, there is no reasonable likelihood of success on the fiduciary duty claim.[11] *See Orkin v. Albert*, 557 F. Supp. 3d 252, 259 (D. Mass. 2021) (finding no likelihood of success on fiduciary duty claim because "almost all the multiple breaches [the plaintiff] alleges are not supported by any evidence").

Relative to the first alleged breach, and as explained in more detail in the factual background, Shaw's and Nagel's communications with Nixer Comp were efforts to promote and pitch the PayGo software as the best solution to meet Nixer Comp's needs. They did not divulge, let alone transfer, confidential or

---

[11]  Out of an abundance of caution, this court also addresses the absence of a reasonable likelihood of success on other breaches, namely, the purported disclosure and/or transfer of confidential and proprietary information to Nixer Comp.

proprietary information of the PayGo software or of PayGo, LLC
during the April 2020 meeting or in other communications with Nixer
Comp or MIS.  (D. 77, ¶¶ 4, 6) (D. 76, ¶¶ 16, 20-21).[12]  Nagel did
not even have access to or knowledge of the confidential or
proprietary information that Schram identifies (D. 71-1, ¶ 25).
(D. 77, ¶ 5).  Furthermore, information in the April 2020 email
chain was a matter of public knowledge.  (D. 77, ¶ 4).  Unlike
Schram, Shaw and Nagel participated in the April 2020 meeting and
Nagel exchanged emails with Schild.  In light of Shaw's and Nagel's
involvement, their declarations and deposition testimony are more
convincing than Schram's affidavit.  Overall, the factual record
does not render it at all likely that Shaw, Nagel, or PMC Insurance
worked with or assisted Nixer Comp to develop an independent,
competitive pay-as-you-go system.  A reasonable likelihood of
success that one or more defendants breached his or its fiduciary
duty by working with or assisting Nixer Comp is decidedly absent.

Turning to the second purported breach, Shaw believed a
cybersecurity consultant needed to evaluate the PayGo software for
cybersecurity vulnerabilities.  (D. 76, ¶ 24).  Contrary to the

---

[12]   Hence, the record falls well short of evidencing a
reasonable likelihood of success that any defendant disclosed or
transferred PayGo, LLC's confidential or proprietary
information.  Extending this reasoning, there is no reasonable
likelihood of success on the claims in Counts Two and Three that
PMC Insurance violated sections 6.3, 6.7.1, and 9.7 by the
purported disclosure and transfer or any irreparable harm by the
purported disclosure and transfer.

plaintiffs' argument (D. 84, p. 6), this reason was not "a ruse to obtain access" to the source code.  An August 2021 warning by Microsoft of a cybersecurity vulnerability discovered in its Azure cloud database and a rise in cybersecurity attacks lend credence to the legitimacy of Shaw's requests.  (D. 76, ¶¶ 24-25, 27-28).  In addition, the plaintiffs' argument that Shaw "wanted the source code so he could . . . test Microsoft's security" (D. 84, p. 6) misconstrues the requests, which seek to test PayGo, LLC's software for cybersecurity vulnerabilities.  In addition to the cybersecurity risk, Shaw justifiably wanted to ensure PayGo, LLC had an appropriate level of insurance in the event of a cybersecurity attack.  (D. 76, ¶ 24) (D. 76-6) (D. 76-5, p. 2).  The MSA also requires E-Probate to make the source code readily available to PayGo, LLC personnel and approved individuals.  (D. 76-3, p. 4).  In short, the plaintiffs fail to provide sufficient evidence to establish a reasonable likelihood of success that Shaw or any defendant breached his or its fiduciary duty by seeking access to the source code and requesting login credentials.

**B.  <u>Breach of Operating Agreement</u>**

Count Two alleges PMC Insurance breached sections 6.3 and 6.7.1 of the Operating Agreement and that each defendant aided and abetted the other.   (D. 45, ¶¶ 32, 35, 80-87).  In seeking a preliminary injunction, the plaintiffs argue that the defendants breached: (1) section 6.7.1 by disclosing or transferring "[PayGo,

LLC's] confidential and proprietary" information, including the PayGo software, to Nixer Comp; and (2) sections 6.3 and 6.7.1 assisting or working with Nixer Comp to develop "a competitive Pay-As-You-Go system while concealing the existence of the sale of the [insurance] policies in order to not pay the 0.7% of the premiums to [PayGo, LLC]." (D. 71, 84). The plaintiffs maintain the parties agreed and the Operating Agreement memorialized that PMC Insurance would pay PayGo, LLC the 0.7% payment on all insurance policies sold using a pay-as-you-go system. (D. 71, p. 5) (D. 71-1, ¶¶ 16, 19, 28).

The defendants again contend that neither Shaw nor Malloy disclosed any confidential or proprietary information to Nixer Comp during the April 2020 meeting or at any other time. Likewise, they submit that Shaw and Malloy did not assist or work with Nixer Comp in developing a pay-as-you-go system that competes with the PayGo software. (D. 75, 90). Relatedly, they argue the plaintiffs do not show a reasonable likelihood of success because the factual record does not support a breach of the Operating Agreement. (D. 75, 90).

"Under Massachusetts law, the elements of a breach of contract claim are that 'there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready" to perform; "the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." *Squeri v. Mount Ida*

*College*, 954 F.3d 56, 71 (1st Cir. 2020).  Contracts "are interpreted according to their plain terms." *Barclays Bank PLC v. Poynter*, 710 F.3d 16, 21 (1st Cir. 2013) (applying Massachusetts law).  "When the words of a contract are clear, they must be construed in their usual and ordinary sense." *Gen. Convention of New Jerusalem in the U.S. of America, Inc. v. MacKenzie*, 874 N.E.2d 1084, 1087 (Mass. 2007); *accord Barclays Bank*, 710 F.3d at 21. Words are not taken in isolation but rather "within the context of the contract as a whole." *Barclays Bank*, 710 F.3d at 21.

Section 6.7.1 of the Operating Agreement states in mandatory terms that PMC Insurance "shall not directly or indirectly . . . participate in, or otherwise be connected with any other insurance PayGo activity without the participation of" PayGo, LLC.  (D. 71-1, § 6.7.1).  At a minimum, the import of this language precludes PMC Insurance from participating in other insurance PayGo activity without PayGo, LLC's participation.  Because the facts themselves by and large preclude the requested injunctive relief, it is not necessary to further define the language of section 6.7.1 at this juncture.

The language of section 6.3 states that "each Member and its Related Parties may engage in any business or activity *other than the business of [PayGo, LLC]* or own any other assets or properties other than its interest in [PayGo, LLC]."  (D. 76-1, § 6.3) (emphasis added).  The Operating Agreement defines "[t]he business

of [PayGo, LLC]" as including "the implementation of software products to support 'pay-as-you-go' insurance sales *and the insurance sales themselves*." (D. 76-1, § 1.3) (emphasis added). The plain language of section 6.3 therefore allows PMC Insurance and its related parties to engage in business except for the business of PayGo, LLC.[13]    PayGo, LLC's business includes implementing insurance sales of workers' compensation policies using the PayGo software. (D. 76-1, §§ 1.3, 3.3) (D. 71-1, ¶¶ 6-8, 12-15).

In contrast, the language of the Operating Agreement does not require PMC Insurance to pay Schram, another member, or PayGo, LLC a 0.7% premium fee on insurance policies sold using a pay-as-you-go system. The Operating Agreement nowhere mentions a 0.7% premium fee. Contrary to the plaintiffs' position, the Operating Agreement does not memorialize a 0.7% premium fee. That said, the second preliminary injunction motion specifically requests this court to order the defendants to pay the 0.7% premium fee on all policies that PMC Insurance "places that use a pay-as-you-go system." (D. 85, p. 11).   The discussion section in subpart III(B)(1)(B)

---

[13]    The plaintiffs do not adequately develop or factually support an argument that any business activities of Nixer Comp and PMC Insurance pursuant to the General Agency Agreement establishes a reasonable likelihood of success that PMC Insurance breached section 6.3. *See Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 476 (1st Cir. 2016) (noting that undeveloped argument is waived) (citation omitted).

provides a more fulsome explanation of the language in the
Operating Agreement which precludes an obligation to pay the 0.7%
premium fee on policies using a pay-as-you-go system other than
the PayGo software system.

As detailed in the factual background and explained in subpart
II(B)(1)(A), albeit in the context of the breach of fiduciary duty
claim, the factual record does not support a reasonable likelihood
of success as to the breaches of sections 6.3 and 6.7.1 the
plaintiffs identify.  More specifically, and for reasons already
explained, the factual record does not sufficiently show that Shaw,
Nagel, or anyone else at PMC Insurance divulged or transferred
confidential or proprietary information of the PayGo software or
of PayGo, LLC during the April 2020 meeting or in other
communications with Nixer Comp or MIS.[14]  (D. 77, ¶¶ 4, 6) (D. 76,
¶¶ 16, 20-21).  Likewise, neither Shaw nor Malloy worked with or
assisted Nixer Comp to develop a pay-as-you-go system that would
compete with the PayGo software system.  Rather than exclude PayGo,
LLC's participation, Shaw and Nagel worked to promote and pitch
the PayGo software.  Contrary to the plaintiffs' assertion (D. 84,
p. 4), the factual record fails to sufficiently show that Shaw,
Nagel, or PMC Insurance's collaboration with Nixer Comp consisted

---

[14]  The above conclusion also forecloses the plaintiffs' one-
sentence argument based on the violation of section 9.7 by any
such disclosure or transfer.  (D. 84, p. 4).

of developing an independent and competitive pay-as-you-go system. Hence, the factual record does not provide sufficient evidence that PMC Insurance breached section 6.3 or section 6.7.1 in the manner the plaintiffs suggest.

The plaintiffs additionally point out that Nagel, on behalf of PMC Insurance, negotiated the shareholder addendum for the transfer of stock in" Nixer Comp. (D. 84, p. 4). Further, "[b]y acquiring this equity interest," PMC Insurance violated sections 6.7.1 and 6.3, according to the plaintiffs. (D. 84, p. 4). As stated in the factual background, "[n]one of the defendants" had "an equity stake of any sort in Nixer Comp," including at the time the plaintiffs filed the first preliminary injunction motion. (D. 90, p. 7, ¶ 1). Accordingly, the plaintiffs' argument that PMC Insurance acquired an equity stake in Nixer Comp and thus violated sections 6.3 and 6.7.1 is not supported by the record. A reasonable likelihood of success that PMC Insurance breached sections 6.7.1 or 6.3 by acquiring an equity interest is therefore absent. *See generally Orkin v. Albert*, 557 F. Supp. 3d at 259.

C. **Breach of Succession Agreement**

Next, the plaintiffs argue that the defendants breached the Succession Agreement or "Succession Plan." (D. 71, 84). They maintain the defendants refused to honor the agreement after Schram "created and delivered the cloud-based software solution." (D. 71, pp. 3-4). The defendants contend the plaintiffs are unable to

show the first element of a breach of contract claim, namely, that a contract exists.  As a result, they cannot show a reasonable likelihood of success on the breach of the Succession Agreement claim, according to the defendants.  (D. 75, pp. 16-17).

As fully explained in the factual background, the plaintiffs fail to sufficiently establish that Schram and the defendants mutually agreed upon a Succession Plan and entered into the Succession Agreement.  Having failed to provide sufficient evidence of a contract, the plaintiffs' showing of a reasonable likelihood of success on the breach of the Succession Agreement claim is absent.

D.  **Breach of Covenant of Good Faith and Fair Dealing**

With respect to the reasonable likelihood of success on the breach of the implied covenant of good faith and fair dealing claim, the plaintiffs state: "By disclosing [confidential and proprietary] information and working with [Nixer Comp], which . . . Defendants [did] without the consent or knowledge of Plaintiffs, Defendants defeated the purpose of the parties' agreement; resulting in a breach of the covenant of good faith and fair dealing."  (D. 71, p. 13).  Like the breach of contract claim, they submit that the purpose of section 6.7.1 ensured the defendants would not work with other companies to develop another "pay-as-you-go insurance product to replace and compete with" the PayGo software.  (D. 71, pp. 1, 13).  By disclosing confidential

and proprietary information to Nixer Comp and working with Nixer Comp to develop competitive software, the defendants defeated the purpose of section 6.7.1 resulting in a breach of the covenant of good faith and fair dealing, according to the plaintiffs. (D. 71, p. 13).

The covenant of good faith and fair dealing "ensure[s] that neither party interferes with the ability of the other to enjoy the fruits of the contract, and that, when performing the obligations of the contract, the parties remain faithful to the intended and agreed expectations of the contract." *Guldseth v. Family Med. Assoc. LLC*, __F.3d__, 2022 WL 3366881, at *6 (1st Cir. Aug. 16, 2022) (citations omitted). The scope of the covenant "is only as broad as the contract that governs the particular relationship." *FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 100 (1st Cir. 2009) (citation omitted); *Chokel v. Genzyme Corp.*, 867 N.E.2d 325, 329 (Mass. 2007). Hence, the covenant does not supply terms to the Operating Agreement "that the parties were free to negotiate, but did not, nor does it "create rights and duties not otherwise provided for in the contract." *FAMM Steel*, 571 F.3d at 100 (citation omitted); *accord Chokel*, 867 N.E.2d at 329.

As with the breach of contract claim, the record belies an adequate showing of a reasonable likelihood of success. In particular, the record does not sufficiently show that Shaw or

Malloy worked with or assisted Nixer Comp to develop a competitive pay-as-you-go system or disclosed, let alone transferred, confidential or proprietary information of PayGo, LLC in performing obligations under the Operating Agreement. The plaintiffs therefore fail to establish a reasonable likelihood of success on the covenant of good faith and fair dealing claim.

## E.   **Alleged Violations of Trade Secret Statutes**

As a final argument pertaining to a reasonable likelihood of success, the plaintiffs maintain the defendants are continuing to violate the "Massachusetts Trade Secrets Act; Uniform Trade Secrets Act; and Defend Trade Secrets Act."[15] (D. 71, p. 14). The defendants correctly point out that the first amended complaint does not plead a violation of these statutes. (D. 75, pp. 17-18). As a result, they reason it is "impossible for the Plaintiffs to meet the burden of establishing a likelihood of success on the merits of a claim that they have not brought in the Amended Complaint." (D. 75, p. 18).

The Massachusetts Uniform Trade Secrets Act ("MUTSA"), Mass. Gen. Laws ch. 93, § 42, and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, set out substantially similar standards for a misappropriation of trade secrets. *Moog, Inc. v. ClearMotion, Inc.*, Civil No. 1:19-cv-12066-IT, 2020 WL 6162921, at *7 (D. Mass.

---

[15]   The plaintiffs do not provide citations for these statutes.

Oct. 21, 2020) ("standards for misappropriation under the DTSA and the Massachusetts statute are substantially similar"); *accord Sensitech, Inc. v. LimeStone FZE*, Civil Action No. 20-11043-NMG, 2022 WL 227132, at *4 (D. Mass. Jan. 26, 2022).  More to the point, the plaintiffs cannot show a reasonable likelihood of success on claims that they fail to bring in the operative complaint.  *See, e.g., Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 47 F. Supp. 3d 1069, 1076 (D. Haw. 2014) (plaintiffs "cannot satisfy the likelihood of success requirement" because "Amended Complaint does not contain a claim . . . in violation of HIPAA and the Hawai'i State Constitution"); *Peace and Freedom Party v. Bowen*, No. 2:12-cv-00853-GEB-EFB, 2012 WL 1455248, at *7 (E.D. Cal. Apr. 26, 2012) (finding no likelihood of success to support injunctive relief because "Plaintiffs' complaint does not include a procedural due process claim").  Having failed to show a reasonable likelihood of success on the purported violations of the "Massachusetts Trade Secrets Act; Uniform Trade Secrets Act; and Defend Trade Secrets Act" (D. 71, p. 14), the plaintiffs are not entitled to injunctive relief on these unpled claims.

## 2.  <u>Irreparable Harm</u>

The plaintiffs maintain irreparable harm will occur because, once the defendants obtain the source code for the PayGo software, the damage is irrevocable.  (D. 71, p. 15).  Monetary damages are therefore insufficient because the source code allows the

defendants to duplicate the PayGo software and "PayGo, LLC's market position will forever be lost."  (D. 71, p. 15).  Separately, the plaintiffs argue that sections 6.7.1 and 9.7 in the Operating Agreement authorize injunctive relief.  (D. 84, pp. 2-3).  The defendants submit that the plaintiffs' delay in filing the original complaint on February 14, 2020, after Schram learned "PMC insurance was participating in selling another PayGo system in violation of [the Operating Agreement]" in November 2019 (D. 1, ¶ 40), militates against finding irreparable harm.  (D. 75, pp. 18-20) (D. 90, p. 6).  They further contend the plaintiffs "cannot legitimately argue that there is a reasonable risk of irreparable harm," and First Circuit caselaw rejects contractual provisions as sufficient to show irreparable harm.  (D. 75, p. 20) (D. 90, pp. 5-6).

Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy."  *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).  "To be entitled to a forward-looking remedy, a plaintiff must satisfy the basic requisites of equitable relief-the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law."  *Joyce v. Town of Dennis*, 720 F.3d 12, 26 (1st Cir. 2013) (emphasis added).  It is also well established that "irreparable harm must be grounded on something more than conjecture, surmise, or a

party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004); *see Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991) (irreparable harm must be demonstrated not assumed).

A decision in this district, *ITyX Solutions, AG v. Kodak Alaris, Inc.*, Civil Action No. 1:16-cv-10250-ADB, 2016 WL 8902596 (D. Mass. Aug. 16, 2016), is instructive.  Under the contract at issue in *ITyx Solutions*, the plaintiff agreed to license certain software to the defendant's predecessor, and the defendant's predecessor agreed to integrate the software into a product and exclusively distribute the product, albeit subject to certain exceptions.  *Id.* at *1-2.  "Info Insight" was the eventual name of the marketed product.  *Id.* at *2.  The contract unequivocally stated that the defendant "shall not develop a product functionally equivalent to [Info Insight]."  *Id.* at *2.  The defendant Kodak Alaris, Inc. ("KA") agreed to "take over" its predecessor's contractual obligations.  *Id.* at *3.  Although a division of KA was "actively considering new potential products and strategies in the" same market as the market for Info Insight, the court found "no evidence that KA ha[d] developed" a competing product "or that such development was imminent."  *Id.* at *8; *see id.* ("mere fact that KA is exploring the development of alternative products even assuming that such conduct violates [the contract] poses no risk

of immediate and irreparable harm to ITyX"). The court proceeded to analyze and reject all five requests for injunctive relief due to the absence of any threat or imminency of irreparable harm. *Id.* at 7-8.

Here too, the record fails to present sufficient, non-speculative facts to support a finding of irreparable harm. To highlight a few of the material facts this court endorses, "[n]o one from PMC Insurance nor its representatives assisted MIS in developing its" pay-as-you-go payment system. (D. 76, ¶ 16). Likewise, Shaw did not assist "Nixer Comp with setting up a" pay-as-you-go product. (D. 76, ¶ 20). Nagel did "not have access to or knowledge of the information technology involved in" PayGo, LLC's pay-as-you-go process. (D. 77, ¶ 5). Overall, the record fails to adduce sufficient evidence that Shaw, Nagel, or PMC Insurance's collaboration with Nixer Comp involved the development of an independent and competitive pay-as-you-go system.

In requesting access to the source code of PayGo software, Shaw sought to reduce cybersecurity vulnerabilities in the software via an assessment by a highly-recommended cybersecurity software consultant. As such, disclosure of source code to the consultant will not irreparably harm E-Probate, which is a member of PayGo, LLC, or Schram, who created the software which now belongs to PayGo, LLC. Similarly, there is no imminent threat that the defendants will transfer any PayGo, LLC business practices

or the company's PayGo software processes to any third party.
Rather, the facts evidence that the defendants did not divulge,
let alone transfer, any confidential or proprietary information of
the PayGo software or of PayGo, LLC during the April 2020 meeting
or in other communications with Nixer Comp or MIS.  (D. 77, ¶¶ 4,
6) (D. 76, ¶¶ 16, 20-21).  Neither Shaw nor Malloy likely disclosed
to Nixer Comp or other members of the insurance industry any trade
secrets or confidential information, including the information
listed in paragraph 25 of Schram's affidavit.  (D. 77, ¶¶ 4-6) (D.
76, ¶¶ 20-21).

As a result, the facts do not adequately show irreparable
harm to support the four requests for injunctive relief.  Overall,
the plaintiffs fail to show the defendants engaged in conduct to
support preliminary injunctive relief or are likely to engage in
such conduct before a full adjudication on the merits when a
permanent injunction, if warranted, may provide adequate
compensation.  In short, the facts found by this court do not
support injunctive relief, and the plaintiffs do not satisfy their
burden to show irreparable harm.

Turning to the injunctive relief provisions, section 9.7
protects PayGo, LLC's trade secrets and confidential information
from misappropriation.  The section expressly states that a breach
of the "restriction would result in irreparable harm."  (D. 76-1,
§ 9.7).  Section 6.7.1 similarly states that a PayGo, LLC member

is "entitled to obtain an injunction" in "the event of a breach, or a threatened breach," of the covenant applicable to PMC Insurance in that section.  (D. 76-1, § 6.7.1).  The defendants are nevertheless correct that these contractual provisions, standing alone, are not sufficient to establish irreparable harm. *See Smith, Bucklin & Assoc., Inc. v. Sonntag*, <u>83 F.3d 476, 481</u>, <u>317</u> (D.C. Ci<u>r. 1996</u>) (although contractual provision states company "suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, this by itself is an insufficient prop") (citation omitted).  In fact, "all Courts of Appeals that have addressed the issue" conclude "that 'the terms of a contract alone cannot require a court to grant equitable relief.'" *Café Indigo, LLC v. Pearl River Pastry, LLC*, Civil No. 20-cv-419-JL, <u>2020 WL 5026745</u>, at *8 (D.N.H. Aug. 25, 2020) (collecting authority) (citations omitted).  Having considered these provisions in the context of the record as a whole, there remains an insufficient showing of irreparable harm.

The plaintiffs separately argue that the Operating Agreement memorializes and includes the parties' agreement that PMC Insurance would pay PayGo, LLC "0.7% on all policies sold using a Pay-As-You-Go System."  (D. 71, pp. 3, 5).  According to the plaintiffs, the parties' agreement is both "memorialized in and made part of the Operating Agreement."  (D. 71, p. 5).  Schram repeats these assertions in his affidavit.  (D. 71-1, ¶¶ 16, 19,

28).   The Operating Agreement itself, however, does not require PMC Insurance to pay PayGo, LLC 0.7% of all premiums from any insurance policy placed by PMC Insurance.   In fact, the Operating Agreement does not include the "0.7%" figure.   It does: include an integration clause; require "all Members" to approve amendments "in writing"; preclude additional capital contributions by members absent agreement; and require PMC Insurance to pay start-up costs and "operating expenses" of PayGo, LLC.   (D. 76-1, §§ 3.2, 6.7.1, 11.2, 11.4).

Regardless, irreparable harm premised on the defendants' failure to pay the 0.7% premium or the concealment of their failure is absent.   (D. 71, p. 15).   As explained recently by the First Circuit:

> A preliminary injunction preserves the court's ability to grant final relief.   *We require a showing of irreparable harm before granting a preliminary injunction* since that harm would "impair the court's ability to grant an effective remedy" following a decision on the merits. Because adequate legal remedies foreclose injunctive relief, the appellants cannot demonstrate irreparable harm without showing that they have inadequate remedies at law.

*Together Emp. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85-86 (1st Cir. 2022) (emphasis added) (citations omitted); see *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (irreparable harm is "injury that cannot adequately be compensated for" by "later-issued damages remedy").   The record fails to show that the defendants cannot adequately compensate the plaintiffs

for any nonpayment or concealment of the nonpayment of the 0.7%
premium with later-issued monetary damages.   Accordingly,
preliminary injunctive relief is not warranted based on the
nonpayment or concealment of the 0.7% premium.

## 3.  **Balance of the Equities**

Balancing the harms involves examining "the hardship to the
nonmovant if enjoined as contrasted with the hardship to the movant
if no injunction issues." *Black Tea Soc'y v. City of Boston*, 378
F.3d 8, 11 (1st Cir. 2004); *accord Nuance Commc'n, Inc. v.
Kovalenko*, Case No. 22-cv-10656-DJC, 2022 WL 2347112, at *10 (D.
Mass. June 29, 2022).  In assessing whether to issue "a preliminary
injunction, a court 'must balance the competing claims of injury
and must consider the effect on each party of the granting or
withholding of the requested relief.'" *Orkin v. Albert*, Civil
Action No. 4:21-40060-TSH, 2022 WL 95947, at *5 (D. Mass. Jan. 10,
2022) (quoting *Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7,
24 (2008)).

Turning to the task, the absence of dissemination of
confidential and proprietary information of PayGo, LLC in the past
renders any harm from dissemination unlikely to occur prior to
trial or a full adjudication on the merits.  At that point, the
court can decide whether to issue injunctive relief, as requested
in the operative complaint (D. 45, p. 12).  It is also decidedly
unlikely that Shaw, Nagel, or PMC Insurance assisted Nixer Comp to

develop a competitive pay-as-you-go system.   The plaintiffs are unlikely to experience harm by not issuing a preliminary injunction ordering the defendants to cease assisting a third-party in developing a pay-as-you-go system.   Conversely, the inequitable conduct of Schram that the defendants identify (D. 75, p. 21) is not convincing as a basis to find the equities weigh in their favor.   On balance, the equities do not strongly favor either party.   Rather, they are relatively neutral.

4.   **Public Interest**

The public interest factor refers to "the public's interest in the issuance of *the injunction itself*."   *Braintree Lab., Inc. v. Citigroup Glob. Mkt., Inc.*, 622 F.3d 36, 45 n.8 (1st Cir. 2010) (emphasis in original).   Overall, this factor is neutral and does not swing heavily in favor of either party.

In conclusion, the absence of an adequate showing of a reasonable likelihood of success and irreparable harm coupled with the neutrality of the remaining factors warrant a recommendation to deny the first preliminary injunction motion.[16]

III.   **SECOND PRELIMINARY INJUNCTION MOTION (D. 85)**

In the second preliminary injunction motion, the plaintiffs segment their argument regarding the likelihood of success on the merits into four categories.   (D. 85, pp. 10-11).   Each category

---

[16]   The recommendation to deny the motion renders it unnecessary to address the defendants' other arguments.

corresponds to one of the four requests for injunctive relief. (D. 85, pp. 11-12).

First, they assert a likelihood of success in showing PMC Insurance breached the Operating Agreement and the defendants breached their fiduciary duties[17] by transferring PMC Insurance's 51% membership interest in PayGo, LLC to A&D Vineyards, LLC ("A&D") in late December 2021. As a result, the plaintiffs ask this court to order Shaw and Malloy return PMC Insurance's equity shares in PayGo, LLC.

Second, as to likelihood of success, the plaintiffs maintain PMC Insurance breached the Operating Agreement and the defendants breached their fiduciary duties "by failing to continue to pay [PayGo, LLC's] operating expenses and the 0.7% fee on premiums." (D. 85, p. 10). Hence, the plaintiffs seek a court order requiring the defendants "to continue funding [PayGo, LLC] and to pay the 0.7% of all premiums" for all insurance policies PMC Insurance "places that use a pay-as-you-go payment system." (D. 85, p. 11).

Third, and again as to likelihood of success, the plaintiffs contend PMC Insurance breached the Operating Agreement and the defendants breached their fiduciary duties "by reaching out to AmTrust and seeking to have AmTrust . . . pull its policies from [PayGo, LLC]." (D. 85, p. 10). Relatedly, the plaintiffs request

---

[17]   *See supra* n.1.

this court order the defendants "[t]o cease interfering with PMC PayGo's relations with its customers, such as AmTrust." (D. 85, p. 12).

Fourth, they assert a likelihood of success in establishing that the defendants breached their fiduciary duties by misappropriating PayGo, LLC's "operating capital to Pay PMC Insurance's attorneys' fees." (D. 85, p. 11). Consequently, they request an order requiring the defendants to refund all the money they took from PayGo, LLC "to pay their attorneys' fees and to take no" additional money for "their attorneys' fees." (D. 85, p. 11).

In addition to other arguments, the defendants maintain the plaintiffs fail to show a reasonable likelihood of success as to each request. (D. 91). They also argue the plaintiffs fail to show irreparable harm. (D. 91, p. 19). The facts, placed in the context of these four categories, are as follows.

## A.  **Factual Background**

## 1.  **Transfer of Interest in PayGo, LLC**

On December 26, 2021, PMC Insurance and A&D executed a Transfer Agreement which transferred PMC Insurance's 51% interest in PayGo, LLC to A&D. (D. 92, ¶ 2) (D. 92-1). Under the terms of the agreement and effective December 26, 2021, A&D "adopt[ed] and agree[d] to be bound by the terms and provisions of the Operating Agreement . . . to the same extent as [PMC Insurance] was bound

prior to [the] assignment." (D. 92-1, ¶ 4) (D. 85-4, p. 2). At the time of the transfer, PMC Insurance and A&D "had the same ownership." (D. 92, ¶ 7). The ownership interests in each company "consist[ed] of 52% by the Gregory W. Malloy Revocable Trust, 24% by [Malloy], and 24% by [Shaw]." (D. 92, ¶ 7).

"Immediately before and after the [t]ransfer," Shaw and Malloy "controlled the operations of PMC Insurance." (D. 92, ¶ 8). Shaw was PMC Insurance's executive vice president and Malloy was the company's president. Likewise, "[i]mmediately before and after the [t]ransfer," Shaw and Malloy controlled A&D. (D. 92, ¶ 8).

In a December 29, 2021 letter to E-Probate in care of Schram, PMC Insurance informed E-Probate about the transfer. (D. 85-4). By affidavit, Schram refers to the letter and attests that the defendants notified him of the transfer on December 31, 2021. (D. 85-1, ¶¶ 6-7). The letter attaches a "Counterpart Signature Page to [the] Operating Agreement executed as of December 26, 2021, by Shaw as an authorized officer of A&D. The document recites A&D's agreement "to be bound by, and subject to, all the terms and provisions of the [Operating] Agreement." (D. 85-4, p. 2).

## 2. **Payment of 0.7% Premium Fee**

By affidavit, Schram states that "payment of the 0.7% on all policies sold using a Pay-As-You-Go system was a core condition to [his] entering the partnership with Defendants as memorialized by

the Operating Agreement." (D. 71-1, ¶ 16). The Operating Agreement does not mention a requirement or condition applicable to PMC Insurance to pay a 0.7% fee on all policies it places using a pay-as-you-go-system. As such, it does not memorialize a requirement for PMC Insurance to pay Schram or E-Probate a 0.7% payment on all such policies.

In a subsequent affidavit, Schram avers "[t]he parties agreed to the 0.7% in an exchange of e-mails in 2010 and PMC has made the 0.7% payment on those policies it disclosed to [p]laintiffs since 2010 to the present." (D. 97-1, ¶ 4). Shaw attests that that PMC Insurance paid and continues to pay commissions to PayGo, LLC "for each policy it has placed with insureds who use [PayGo, LLC] to process premiums." (D. 92, ¶ 10). Gregory Malloy, a manager of PayGo, LLC prior to his death (D. 85-5, p. 5) (D. 91, p. 12), agrees that PMC Insurance paid PayGo, LLC commissions for the insurance policies PMC Insurance placed that used the [PayGo software] system." (D. 93-1, p. 4).

### 3. <u>Transfer from PayGo Software to AmTrust PayO</u>

In 2021, a workers' compensation insurance policy for National Staffing Solutions, the insured, came up for renewal with PMC Insurance. As the insured, it is National Staffing Solutions which decides what pay-as—you go system to use. (D. 45, ¶ 18) (D. 48, ¶ 18) (D. 76, ¶ 7). In the context of renewing the policy for the November 16, 2021 to November 16, 2022 policy term (D. 85-6,

p. 7), National Staffing Solutions requested to use its insurance carrier's (AmTrust's) pay-as-you-go system, AmTrust PayO.  (D. 92, ¶ 13).  In fact, National Staffing Solutions "made it a condition of renewal."  (D. 92, ¶ 13).  PMC Insurance complied and set up National Staffing Solutions' account to use AmTrust PayO.  (D. 92, ¶ 13).

In a series of emails in early January 2022, PMC Insurance officials and Chris Amato, a "PAYO Manager at AmTrust Financial Services, Inc.," discussed changing the AmTrust PayO Self Reporting system for National Staffing Solutions to PayO with CertiPay.  (D. 85-6, p. 2).  One of the emails states there is "[n]o reason to include [Schram] in the response."  (D. 85-6, p. 4).  In or around January 4, 2022, Schram learned about the matter.  (D. 85-1, ¶ 8) (D. 85-6, p. 4).  More specifically, he describes learning that Malloy, Shaw, and PMC Insurance "reached out to AmTrust" seeking to pull insurance policies "from the [PayGo software] system" (D. 85-1, ¶ 8) and shift them "to AmTrust's limited and poorly structured" system.  (D. 85-1, ¶ 8).  As indicated in the previous paragraph, Schram's interpretation of what occurred is incorrect.  (D. 92, ¶ 13).

In or around January 2022, Amtrust came to believe "it could not support the account effectively and requested that PMC Insurance" move the account back to the PayGo software system.  (D. 92, ¶ 13) (D. 92-2, p. 3).  The PMC Insurance "team reached

out to [National Staffing Solutions] and" convinced the company to move back to using the PayGo software.  (D. 92, ¶ 13) (D. 92-2, p. 3).  In mid-to-late January 2022, PMC Insurance placed the National Staffing Solutions account back on the PayGo software system.  PMC Insurance therefore "retained an insured using [the PayGo software system] that was seeking to use a different" pay-as-you-go product.  (D. 92, ¶ 13) (D. 92-2, p. 3).

**4.  PayGo, LLC's Payment of PMC Insurance's Attorneys' Fees**

On December 2, 2021, PMC Insurance, individually and derivatively on behalf of PayGo, LLC, filed a state court action against Schram and E-Probate.  (D. 85-2).  Morse, Barnes-Brown & Pendleton, PC ("Morse, PC") represents PMC Insurance in the state court action.  (D. 85-2) (D. 97-1, ¶ 2).  Effective December 13, 2021, a transfer of $28,198.50 from PayGo, LLC's bank account was made "directly to" Morse, PC.   (D. 92, ¶ 11).  At or around this time, "PMC Insurance's accounting department deducted $28,198.50 from the [PayGo, LLC]" bank account "as an advance against the year-end distribution" from PayGo, LLC to PMC Insurance as a member of PayGo, LLC.  (D. 92, ¶ 11) (D. 85-5, § 5.2).  After PMC Insurance learned about the $28,198.50 direct transfer to their law firm, "Malloy and [Shaw] directed that $28,198.50 be placed back into" PayGo, LLC's bank account.  (D. 92, ¶ 11).  PMC Insurance did not

charge PayGo, LLC for these legal fees.[18]  (D. 92, ¶ 11).  Having considered Schram's averment that the transfer entailed several steps (D. 97-1, ¶ 2), the payment was nevertheless an unintentional error (D. 92, ¶ 11).

In a January 28, 2022 affidavit, Shaw states the "transfer has been initiated."  (D. 92, ¶ 11).  By affidavit dated February 25, 2002, however, Schram attests the "[d]efendants have not reimbursed [PayGo, LLC] for the $28,198.20."  (D. 97-1, ¶ 1).

## B.  Discussion

As previously noted, the defendants assert that the plaintiffs fail to show a reasonable likelihood of success.  (D. 91, § III).  The defendants further contend the plaintiffs fail to show irreparable harm or, in fact, "any evidence of any risk of irreparable harm."  (D. 91, § IV).  The plaintiffs disagree.  (D. 85, 97).  Segmented into the four categories, this court turns to likelihood of success and the specific arguments relative to each category.

### 1.  Reasonable Likelihood of Success

The plaintiffs argue they are likely to succeed on the merits by showing that PMC Insurance breached the terms of the Operating

---

[18]  The plaintiffs assert the payment was "illegal" because "PMC Insurance is not automatically entitled to" attorneys' fees for bringing a derivative action under Massachusetts General Laws chapter 156C, section 57.  (D. 85, pp. 4–5).  The argument does not alter this court's recommendation on the motion.  (D. 85).

Agreement (Count Two) and the defendants breached their fiduciary duties (Count One).[19]   (D. 85, pp. 10-11).   They do not argue a likelihood of success on the merits of the breach of the covenant of good faith and fair dealing claim (Count Three).[20]   Hence, the undeveloped argument is waived.   *See Diaz-Colon v. Fuentes-Agostini*, 786 F.3d 144, 149 (1st Cir. 2015); *Coons v. Indus. Knife Co., Inc.*, 620 F.3d 38, 44 (1st Cir. 2010).   Accordingly, this court confines the analysis of the likelihood of success to the breach of fiduciary duty and breach of contract claims in Counts One and Two.

## A.   <u>Transfer of Interest in PayGo, LLC</u>

The parties dispute whether the transfer to A&D breached the relevant provisions of the Operating Agreement.   The defendants reason that section 8.2 of the Operating Agreement permits the transfer.   (D. 91, pp. 5-11).   Conversely, the plaintiffs maintain that section 8.1 takes precedence over section 8.2.   They also argue that the transfer requires unanimous approval as a major decision within the meaning of section 6.2.2 because it alters the structure of PayGo, LLC.   (D. 85, pp. 6-7).   Relatedly, the plaintiffs submit the transfer therefore destroys the purpose of

---

[19]   *See supra* n.1.
[20]   In contrast, the first preliminary injunction motion states on the first page that the defendants "breached the covenant of good faith and fair dealing" and repeats the argument in the section addressing the likelihood of success on the merits.   (D. 71, pp. 1, 12-14).

the Operating Agreement set out in its "whereas" paragraph as well as section 1.3.  (D. 85-5, p. 3) (D. 85, pp. 5-6).

To state the obvious, a reasonable likelihood of success on the breach of contract claim necessarily encompasses showing that PMC Insurance breached the terms of the Operating Agreement regarding the transfer to A&D.  Accordingly, this court turns to the terms of the Operating Agreement and the parties' arguments relative thereto.

Examining the Operating Agreement's provisions, Article VIII addresses transfers by members of their interests in PayGo, LLC, including ownership interests of a member to a "Related Party." (85-5, § 8.2).  Section 8.1 reads:

> *Except as expressly provided in this Article VIII*, no Member shall sell, assign, transfer, mortgage, charge or otherwise encumber, or suffer or permit any Third Party to sell, assign, transfer, mortgage, charge or otherwise encumber, or contract to do or permit any of the foregoing, whether voluntarily or by operation by law (collectively referred to as a "Transfer"), any part or all of its Interest or membership in the Company.

(D. 85-5, § 8.1) (emphasis added).  The introductory "except" clause signals that the general rule prohibiting all transfers which follows the clause is not absolute.  *See, e.g., Savage v. City of Springfield*, No. 1679CV00364, 2021 WL 7083094, at *4 (Mass. Super. Dec. 21, 2021) ("prefatory clause of § 73-9, '[e]xcept as provided for in this article,' signals that" residency requirement language thereafter "is not absolute and that one or more

exceptions in the article apply"); *see also Centennial Ins. Co. v. Fireman's Fund Ins. Co.*, Civ. A. No. 86-3540-Z, <u>1987 WL 19297</u>, at *2 (D. Mass. 1987) (language in section 2(b)'s clause "must have a narrower meaning than that in the introductory clause" which precedes section 2(b)).   Thus, when the plain language of a subsection in Article VIII allows the transfer of PMC Insurance's interest to A&D, the terms in the subsection create an exception to the general prohibition for all transfers in subsection 8.1.

The defendants maintain that the transfer to A&D fits squarely within the language allowing a transfer to a "Related Party" in subsection 8.2, and that A&D falls within the definition of a "Related Party" in section 2.1.  (D. 91, pp. 6-7).  Examining these provisions, the exception to the general prohibition in section 8.1 created in section 8.2 states:

> The restrictions set forth in this Article VIII *shall not* be construed to limit or *restrict in any way a transfer by a Member of its Interest in the Company to a Related Party of such Member*, provided that the transferee shall be controlled by the transferring Member or the entity *or individual(s) that controlled such transferring Member immediately prior to such transfe<u>r.</u>*

<u>(D</u>. 85-5, § 8.2) (emphasis added).   Here, the transfer "by a Member," i.e., PMC Insurance, of its interest "to a 'Related Party'" is permissible if A&D is a "Related Party" and controlled by the individuals (Shaw and Malloy) "that controlled such transferring Member" (PMC Insurance) "immediately prior to" the

transfer.   The Operating Agreement defines "Related Party" as follows:

> "Related Party" shall mean with respect to any Person, (i) any Person who directly or indirectly through one or more intermediaries controls, is controlled by, or *is under common control with such Person*, or (ii) any Person in which such Person has a twenty-five percent (25%) or more beneficial interest.   A Person shall be deemed to control a Person if it owns, directly or indirectly, at least twenty-five percent (25%) of the ownership interest in such Person or otherwise has the power to direct the management, operations or business of such Person.[21]

(D. 85-5, § 2.1) (emphasis added).

With respect to A&D's status as a "Related Party" under subsection (i), and as explained in greater detail in the factual background, Shaw and Malloy controlled A&D, the transferee, as managers of A&D immediately before and after the transfer.   (D. 92, ¶ 8).   They also controlled the operations of PMC Insurance immediately before and after the transfer.   At the time of the transfer, the same two individuals, Shaw and Malloy, controlled PMC Insurance and A&D.   Accordingly, A&D is a "Related Party" to PMC Insurance because A&D was under "common control" with PMC Insurance.

Next, the language of section 8.2 requires A&D, the transferee, to "be controlled by the transferring Member" (PMC

---

[21] The Operating Agreement defines a "Person" as including "any individual or Entity" and an "Entity" as including a "limited partnership, corporation, [or] limited liability company."   (D. 85-5, § 2.1).

Insurance) or the individuals "that controlled" the "transferring Member immediately prior to the transfer." (D. 85-5, § 8.2).  Here again, Shaw and Malloy controlled PMC Insurance immediately prior to the transfer as the company's president and vice president, respectively.  A&D therefore falls within the scope of the language in section 8.2.

The plaintiffs nevertheless rely on section 6.2.2.  Section 6.2.2 addresses what action(s) constitutes a "Major Decision." (D. 85-5, § 6.2.2).  The plaintiffs contend that the transfer altered the structure of PayGo, LLC.  (D. 85, p. 5).  Further, under section 6.2.2, they point out that a "Major Decision" includes "'amend[ing] this agreement or knowingly tak[ing] or permit[ting] any action to occur which would adversely affect or otherwise alter the structure of the Company.'"  (D. 85, p. 6) (quoting section 6.2.2(b)).

Before and after the transfer, however, PayGo, LLC remained a limited liability company held by two members controlling 51% and 49% in the company.  Moreover, A&D, like PMC Insurance, remained legally bound to the Operating Agreement.  Specifically, A&D remained bound by the Operating Agreement by virtue of the Counterpart Signature Page document (D. 85-4, p. 2) and the language in section four of the Transfer Agreement (D. 92-1, ¶ 4). Accordingly, the transfer did not adversely affect or alter the structure of PayGo, LLC within the meaning of section 6.2.2(b) or

amend the Operating Agreement within the meaning of this subsection.

In the alternative, and as argued by the defendants, section 8.2 is a more specific provision regarding the purported conduct at issue, i.e., transferring PMC Insurance's interest to A&D. As such, it controls and takes precedence over the more general language in section 6.2.2. *See Astra USA, Inc. v. Bildman*, 914 N.E.2d 36, 55 (Mass. 2009) (recognizing "cardinal principle of contract interpretation under which a more specific contract provision controls a more general provision on the same issue") (citations omitted). The same reasoning applies to the more general language in section 1.3 and the related whereas paragraph relied upon by the plaintiffs.

The plaintiffs also argue that "the '[n]otwithstanding' language of section 8.1 controls" and "must be met before any Member may transfer" its interest. (D. 85, p. 7). The language reads as follows:

> Notwithstanding anything in this Article VIII or this Agreement to the contrary, no Member shall have the right to effect any Transfer of its Interest in the Company if the Transfer, in the reasonable opinion of counsel to the Company, may constitute a violation of any state or federal securities laws or other applicable law or a violation of any provision in any loan document to which the Company is bound.

(D. 85-5, § 8.1).   The plaintiffs fail to show an opinion of counsel to PayGo, LLC regarding the violations of state or federal securities laws.  The provision therefore does not apply.

In sum, section 8.2 of the Operating Agreement permitted the transfer of the 51% membership interest of PMC Insurance to A&D. Accordingly, the transfer did not breach the Operating Agreement. The plaintiffs therefore fail to establish a reasonable likelihood of success on the breach of contract claim relative to the transfer.

With respect to the breach of fiduciary duty claim, the plaintiffs argue that "removing an entity as a Member" deprives PayGo, LLC of funding that the Operating Agreement requires PMC Insurance provide. (D. 85, pp. 1-2, 7-8).  The unilateral transfer of PMC Insurance's interest to A&D in violation of the Operating Agreement therefore purportedly harmed PayGo, LLC and Schram. (D. 85).  The defendants submit the plaintiffs cite "zero evidence" to support the first assertion. (D. 91, p. 16).  They further point out that A&D agreed to be bound by the Operating Agreement to the same extent as PMC Insurance, thus precluding the plaintiffs' contention of any deprivation of funding from PMC Insurance. (D. 91, pp. 15-16).  The defendants also argue that the transfer complied with the Operating Agreement. (D. 91, p. 16).

As the defendants correctly point out, A&D agreed to be bound by the Operating Agreement to the same extent as PMC Insurance.

In broad language, section four of the Transfer Agreement states that A&D "adopts and agrees to be bound by the terms and provisions of the Operating Agreement and any other document by which [PayGo, LLC] may be bound to the same extent as [PMC Insurance] was bound prior to" the assignment.   (D. 92-1, p. 3).   The Counterpart Signature Page document reiterates and reinforces A&D's agreement to be bound by the terms of the Operating Agreement.   (D. 85-4, p. 2).   As a result, A&D assumed the obligations of PMC Insurance to "fund the start up costs, agreed upon business expenses, salaries and other operating expenses of" PayGo, LLC.[22]   (D. 85-5, § 6.7.1). Hence, the plaintiffs fail to provide sufficient evidence to support their contention that the defendants breached their fiduciary duty by depriving PayGo, LLC of the funding the Operating Agreement required PMC Insurance to provide.   By agreeing to be bound by the Operating Agreement, A&D assumed the funding obligations the Operating Agreement imposed on PMC Insurance.   A reasonable likelihood of success on the merits of the breach of fiduciary duty claim premised on removing PMC Insurance as a member and transferring its interest to A&D is a nonstarter.

---

[22]   Whether the Operating Agreement required or continues to require PMC Insurance to bear the cost of "operating expenses" is part of the motion to compel arbitration.   (D. 50, ¶ 3(v)). This opinion expenses no opinion on whether PMC or A&D on the one hand, and PayGo, LLC on the other hand should bear those costs.

**B.   Payment of 0.7% Premium Fee**

Next, with respect to a reasonable likelihood of success, the plaintiffs maintain PMC Insurance breached the Operating Agreement and the defendants breached their fiduciary duties by failing to pay the 0.7% premium fee on all policies PMC Insurance places using a pay-as-you-go system.   (D. 85).   Moreover, the defendants diverted and concealed premiums "which PMC Insurance was required to pay [PayGo, LLC]," according to the plaintiffs.   (D. 85, p. 2). The defendants assert the Operating Agreement does not require PMC Insurance to pay the 0.7% premium fee on all policies PMC Insurance places which use a pay-as-you-go system.   Further, they note that PMC Insurance "has paid, and continues to pay, commissions" on policies it placed with insured who use the PayGo software to process premiums.   (D. 92, ¶ 10).

Turning to the breach of contract claim, the terms of the Operating Agreement do not mention or require PMC Insurance to pay PayGo, LLC the 0.7% premium fee on all insurance policies placed by PMC Insurance.   As explained in part II(B)(2), the Operating Agreement does not include the "0.7%" figure.   It does, however, include an integration clause and requires "all Members" approve amendments "in writing."   (D. 85-5, §§ 11.2, 11.4).   Schram's averment that "[t]he parties agreed to the 0.7% in an exchange of emails in 2010" (D. 97-1, ¶ 4) does not provide sufficient evidence rising to a reasonable likelihood that PMC Insurance breached the

Operating Agreement regarding the 0.7% fee.  First, if the email exchange preceded the July 22, 2010 Operating Agreement, the integration clause states, in no uncertain terms, that the Operating Agreement "supersedes any prior written or oral agreement with respect to the subject matter of this Agreement." (D. 76-1, § 11.4).  Second, if the 2010 email exchange postdated the July 22, 2010 Operating Agreement, that agreement bars any amendment absent written "approval of Members," a phrase which means the approval of the majority member, PMC Insurance.  (D. 85-5, §§ 6.1, 11.2).  There is little indication that PMC Insurance agreed to any such amendment because it opposes the plaintiffs' motion.  (D. 91).

The breach of fiduciary duty claim presents a greater chance to succeed on the merits than the breach of contract claim.  PMC Insurance, as holder of the majority interest in PayGo, LLC, owes a fiduciary duty of utmost good faith and loyalty to E-Probate, holder of the minority interest.  *See Tucci*, 70 N.E.3d at 926; *Kadrmas*, 135 N.E.3d at 234 (citations omitted).  Shaw, PMC Insurance's executive vice president, and Malloy, PMC Insurance's president, each own 24% of PMC Insurance.  (D. 92, ¶ 7).  As noted previously, this court assumes, for present purposes only, that Malloy and Shaw, as managers of PayGo, LLC, owe a fiduciary duty

to PayGo, LLC's members.[23]   As holders of ownership interests in PMC Insurance, Malloy and Shaw potentially benefit from PMC Insurance retaining the 0.7% premium fee on policies placed with insureds who choose to use a pay-as-you-go system other than the PayGo software system.   Moreover, the duty of utmost good faith and loyalty precludes acting "out of avarice, expediency or self-interest in derogation of" this "strict duty of loyalty." *Donahue*, 328 N.E.2d at 515, 517.

The fiduciary duty of utmost good faith and loyalty, however, is evaluated in the context of the Operating Agreement. *See Butler v. Moore*, Civil No. 10-10207-FDS, 2015 WL 1409676, at *89 (D. Mass. Mar. 26, 2015) (terminated employee's breach of fiduciary duty claim depends on "interplay between" employment agreement allowing termination without cause and duty of majority shareholders "to act with utmost good faith and loyalty").   Drawing analogies to the employment agreement in *Butler*, the Operating Agreement and its failure to require PMC Insurance to pay a 0.7% premium fee on all policies placed which use a pay-as-you-go system is therefore "taken into account" when evaluating the reasonable expectations

---

[23]   The issue is not fully briefed, and the unsettled nature of Massachusetts case law in this diversity action warrants such briefing.   *See supra* n.10.   At this juncture and assuming the existence of a fiduciary duty, any showing of a reasonable likelihood of success on the breach of fiduciary claim is, at most, weak.   Ultimately and even considering a weak showing, the strong showing regarding the absence of irreparable harm and the neutrality of the remaining factors preclude injunctive relief.

of E-Probate, the minority member of PayGo, LLC.  *See id.*
(employment "agreement must be taken into account when evaluating
[terminated employee's] reasonable expectations as to his role and
future in the enterprise"); *see also Kadrmas*, <u>135 N.E.3d at 234</u>.

Here, the evidence does not support an obligation by PMC
Insurance to PayGo, LLC to pay the 0.7% premium fee on policies
placed other than for policies using the PayGo software system.
PMC Insurance paid and continues to pay all commissions to PayGo,
LLC on policies it placed with insureds who use the PayGo software
to process premiums.  (D. 92, ¶ 10).  Considering all the
circumstances, the plaintiffs fail to show a reasonable likelihood
of success on the breach of fiduciary duty claim regarding the
0.7% premium fee.

**C.**  <u>**Transfer of PayGo Software to AmTrust PayO**</u>

The plaintiffs next assert that PMC Insurance breached the
Operating Agreement and the defendants breached their fiduciary
duties "by reaching out to AmTrust and seeking to have AmTrust .
. . pull its policies from [the PayGo software system]."  (D. 85,
pp. 10-11).  As a result, they submit they are likely to succeed
on the merits of the breach of contract and breach of fiduciary
duty claims.  (D. 85, pp. 10-11).  The defendants argue that the
insured, National Staffing Solutions, made the decision to change
from the PayGo software system to the AmTrust system.  Not only
was the decision not a breach of the Operating Agreement, but the

plaintiffs misinterpret the email chain (D. 85-6), according to the defendants.  In addition, they point out that Schram's January 7, 2022 affidavit merely states he learned about the matter and fails to detail the circumstances of "how, where, from whom, or exactly when he supposedly learned it."  (D. 91, p. 15).

The plaintiffs' asserted breach of the Operating Agreement consists of the defendants "reaching out to AmTrust and seeking to have AmTrust . . . pull its policies from [the PayGo software system]."  (D. 85, p. 10).  As explained in the factual background, the asserted breach rests on Schram's incorrect interpretation of what occurred.  The plaintiffs' argument also fails to specify the section of the Operating Agreement purportedly breached.  (D. 85, pp. 9-10).  Inasmuch as the facts found by this court do not support the breach asserted by the plaintiffs, they fail in their burden to establish a likelihood of success on the breach of contract claim regarding AmTrust.

As to the breach of fiduciary duty claim, National Staffing Solutions is the insured, "and it is the insured" entity which "decides whether or not to purchase" and use the PayGo software system.  (D. 45, ¶ 18) (D. 48, ¶ 18).  National Staffing Solutions made the use of its carrier's pay-as-you-go system a condition to renew the policy.  (D. 92, ¶ 13).  In January 2022, PMC Insurance reached out to National Staffing Solutions and successfully convinced it to use the PayGo software system.  In or around the

third week in January, PMC Insurance placed the account back to using the PayGo software system. PMC Insurance's successful efforts thus retained an insured using the PayGo software system that was seeking to use a different pay-as-you-go product. (D. 92, ¶ 13). Such facts belie the existence of a reasonable likelihood of success on the breach of fiduciary duty claim regarding AmTrust.

**D.  PayGo, LLC's Payment of PMC Insurance's Attorneys' Fees**

As a basis to show a likelihood of success on the merits of the breach of fiduciary claim, the plaintiffs argue that the defendants withdrew $28,198.50 from the PayGo, LLC bank account and transferred it to their attorneys. (D. 85, 97). The defendants used PayGo, LLC capital to pay their attorneys' fees, according to the plaintiffs. (D. 85, 97). Supported by Schram's affidavit, the plaintiffs assert the transfer was not a simple mistake because Shaw had to direct PMC Insurance's Finance Director to obtain information from Morse, PC, and the Finance Director had to set up an account for Morse, PC. (D. 97-1, ¶ 2) (D. 97). The plaintiffs point out he then had to transfer the funds from the PayGo, LLC bank account to the Morse, PC bank account. (D. 97-1, ¶ 2) (D. 97). The defendants contend the transfer directly to Morse, PC was an advance against a year-end distribution and, in any event, "an unintentional clerical error." (D. 91, p. 12).

Removing or diverting corporate assets for personal gain without any benefit to the corporation likely constitutes a breach of fiduciary duty. *See Boston Grand Prix,* 624 B.R. at 19 (citation omitted). Shaw, however, disclosed the mistake, acted in good faith, and sought the return of the money to PayGo, LLH within a short period of time after the transfer. Accordingly, there is sufficient evidence of good faith to render the showing of a reasonable likelihood of success decidedly weak.[24] *See id.* at *20 (citations omitted).

## 2. **Irreparable Harm**

The plaintiffs fail to show any significant harm, let alone irreparable harm, regarding the transfer to A&D. A&D's agreement to be bound by the terms and provisions of the Operating Agreement to the same extent as PMC Insurance (D. 92-1, ¶ 4) (85-4, p. 2) largely eviscerates any showing of irreparable harm. The plaintiffs' unsubstantiated concern about future harms is speculative. *See Charlesbank Equity Fund II*, 370 F.3d at 162. Coupled with the failure to show a reasonable likelihood of success on the merits, a preliminary injunction requiring "Shaw and Malloy to return to PMC Insurance its equity shares in" PayGo, LLC (D. 85, p. 11) is inappropriate.

---

[24]   As discussed below, there is no irreparable harm.

Next, there is little, if any, indication that the transfer of $28,198.50 to Morse, PC resulted in irreparable harm to the plaintiffs.   First, there is a dearth of evidence that the defendants cannot compensate the plaintiffs for any loss resulting from the inadvertent transfer with a later-issued damages remedy. *See Rio Grande Cmty. Health Ctr.,* 397 F.3d at 76.   In late January 2022, Shaw and Malloy "directed that $28,198.50 be placed back into" the PayGo, LLC bank account.   (D. 92, ¶ 11).   Although Schram avers the defendants have not reimbursed PayGo, LLH for the $28,198.50 as of February 25, 2022, this court draws the reasonable inference that the reimbursement took place thereafter in light of Malloy's and Shaw's instructions to place the funds back into the company's bank account.   (D. 92, ¶ 11).   Overall, the plaintiffs decidedly fail to show irreparable harm regarding the transfer.

With respect to the 0.7% premium fee, the adequacy of a later-issued damages remedy precludes the existence of irreparable harm. There is insufficient evidence in the record to show that the defendants cannot adequately compensate the plaintiffs for any nonpayment or concealment of the nonpayment of the 0.7% premium fee with monetary damages in the event of a final resolution in the plaintiffs' favor.

As to the transfer to AmTrust PayO, the time during which National Staffing Solutions used AmTrust PayO or PayO with Certipay during the November 16, 2021 to November 16, 2022 policy term is

relatively brief.   PMC Insurance placed the National Staffing Solutions account back on the PayGo software system in mid-to-late January 2022.   Here again, the existence of an adequate later-issued monetary remedy shows the absence of irreparable harm.

In any event, with respect to all four categories, the plaintiffs' irreparable harm argument is that:

> Defendants will place [PayGo, LLC] in a financial position from which it may not be able to recover, resulting in the collapse of the company . . . Unless the court steps in [to] maintain[] the status quo, Defendants will continue down the path of destroying [PayGo, LLC] along with [Schram].

(D. 85, p. 11).   The defendants, however, "continue[] to work to make [PayGo, LLC] successful."   (D. 92, ¶ 14).   Indeed, in 2020 and 2021, PayGo, LLC grew "in premiums processed, number of users, and revenue."   (D. 92, ¶ 14).   The plaintiffs' concern about the future financial instability of the company is unsubstantiated and rests on conjecture.   *See Charlesbank Equity Fund II*, 370 F.3d at 162.

In short, a showing of irreparable harm is required "before granting a preliminary injunction."   *See Together Emp.*, 32 F.4th at 85-86 (citations omitted).   "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant."   *González-Droz v. González-Colon*, 573 F.3d 75, 79 (1st Cir. 2009) (citation omitted).   The plaintiffs fail to make that showing.   The remaining factors, i.e., the

balance of the equities and the public interest, are by and large neutral.

In conclusion, and having balanced all the four factors regarding injunctive relief, such relief is not warranted on the second preliminary injunction motion.

## IV.  MOTION TO STRIKE (D. 79)

The defendants move to strike paragraphs 25, 32, 33, and the last three words of paragraph 26 in Schram's November 12, 2021 affidavit.  (D. 79).  The plaintiffs oppose the motion.   (D. 83).

Turning to the requests seriatim, as stated in footnote seven, this court would reach the same recommendation to deny injunctive relief regardless of paragraph 25, and the motion to strike paragraph 25 is therefore moot.  By way of further explanation, the related text in the body of the opinion explains that Schram did not participate in the meetings and conversations with Schild. Although Schram can review emails to ascertain if matters therein encompass confidential information belonging to PayGo, LLC, he did not participate in the meetings and conversations among Schild, Shaw, and/or Nagel.  Hence, this court afforded less weight to the averments in paragraph 25 than to the averments and deposition testimony by Shaw and Nagel.  Thus, because this court would reach the same recommendation to deny injunctive relief, the request to strike paragraph 25 is moot.

In paragraph 26, the defendants seek to strike the words "under false pretenses" as "'unsupported, speculative assertions.'" (D. 80, p. 4) (quoting *Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307, 315 (1st Cir. 2016)). The words characterize Shaw's efforts to obtain the source code for the PayGo software. As indicated in part II(B)(1)(A) in the discussion section regarding the first preliminary injunction motion, Shaw's reasons for seeking the source code were legitimate. In the wake of increased cybersecurity incidents, Shaw legitimately sought to guard the PayGo software against cybersecurity attacks by having a consultant evaluate the software. Hence, Shaw's requests for the source code were bona fide as opposed to made under false pretenses. The "false pretenses" language in paragraph 26 does not change the recommendation to deny the requests for injunctive relief. Accordingly, the motion to strike the "false pretenses" language is moot.

As to paragraphs 32 and 33, the defendants maintain they are conclusions of law and otherwise not helpful to the trier of fact. (D. 80, p. 6). Both paragraphs state that the "[d]efendants breached" the Operating Agreement and/or the Succession Plan for various reasons. (D. 71-1, ¶¶ 32-33). As such, they amount to legal conclusions regarding the defendants' breach and is stricken. *See CrossFit, Inc. v. Mustapha*, Civil Action No. 13-11498-FDS, 2013 WL 12175101, at *1 (D. Mass. Oct. 18, 2013)

(striking portions of affidavit used to oppose preliminary injunction motion as containing argument and legal conclusions); *Tyco Healthcare Grp. LP v. Kimberly-Clark Corp.*, 463 F. Supp. 2d 127, 131 (D. Mass. 2006) (striking portions of affidavit submitted to oppose preliminary injunction motion as "attest[ing] to final conclusions of law"). Thus, the motion to strike paragraphs 32 and 33 is allowed.

## IV. **CONCLUSION**

In accordance with the foregoing discussion, this court recommends that the motions for a preliminary injunction (D. 71, 85) be **DENIED**.[25] The motion to strike (D. 79) is **ALLOWED** as to paragraph 32 and 33 and otherwise **MOOT**.

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED: September 1, 2022

---

[25] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986).